HEARD NOVEMBER TERM, 1875.

## WITSELL *vs.* CHARLESTON.

Under Article XIV, Section 8, of the Constitution of the State, a married woman has power to alienate her equitable estate in stock held by her at the time of the adoption of the Constitution.

A declaration in a bequest of personal property for the sole and separate use of a woman, that it shall not be liable for her debts or the debts or contracts of any husband she may marry hereafter, imposes no restraint upon her power of alienation.

A married woman having power to alienate her separate estate may pledge the same as security for her husband's debts.

A municipal corporation is liable to a *cestui que trust* for an illegal transfer to a stranger of shares of its stock standing in the name of a trustee.

BEFORE REED, J., AT CHARLESTON, JUNE, 1875.

Action by Mary S. Witsell, plaintiff, against the City Council of Charleston and George W. Williams & Co., defendants.

The case was referred to J. E. Burke, Esq., as Referee, and the facts are fully stated in his report, which is as follows:

This case was referred to me to inquire as to the matters stated in the pleadings, and to report upon all the issues of law and fact involved in the case, with leave to report any special matter.

I beg leave to report that I have been attended by the attorneys herein, have examined the pleadings, and taken the testimony herewith filed as a part of this report, and find the following facts:

I. That Alexander Fraser died in the year 1854, leaving a last will and testament, whereby he bequeathed to plaintiff a legacy of $9,000, payable on the death of his wife, Mary Fraser; and directed that such legacy should be invested for plaintiff's sole, separate and exclusive benefit and behoof, and not be in any manner liable for her debts, or for any debts and contracts of any husband she might marry thereafter.

II. That said testator provided in his said will that the legacies bequeathed therein should be paid in such stocks or bonds as his estate might be invested in at the decease of his wife.

III. That Mary Fraser was appointed executrix of said will, and proved the same, and qualified thereon October 20, 1854. She died subsequently, and after the close of the late civil war, (the precise time is not given in the evidence,) leaving a will whereof Jane Neyle was appointed executrix. Said Jane Neyle proved said will and duly qualified as executrix.

IV. That at the time of the death of Mary Fraser, a part of her

husband's estate was invested in stock issued by the City Council of Charleston; and in the distribution of the estate plaintiff selected $4,280 of said stock in part payment of her legacy of $9,000.

V. That after the death of Mary Fraser, Jane Neyle, the executrix of her will, endorsed the certificate of stock which plaintiff had selected as part of her legacy, and which stood in the name of estate of Dr. Alexan'der Fraser, as follows: "Transfer to Jane Neyle, trustee of Mary S. Witsell.  Jane Neyle, executrix."

VI. That the said Jane Neyle departed this life in 1869, and Henry M. Neyle administered upon her estate; and he endorsed said certificates as follows: "Transfer the within scrip to Charles E. Miller, trustee of Emanuel and Mary S. Witsell, and pay the interest, as it becomes due, to the order of Mary S. Witsell." Signed Henry Neyle, administrator Jane Neyle.

VII. That Emanuel Witsell and plaintiff were married in 1858. Plaintiff was a daughter of Jane Neyle, who lived with Dr. and Mrs. Emanuel Witsell up to the time of her death.

VIII. That the scrip for the said stock was kept in a trunk in the house of said Dr. Witsell, and after the death of Mrs. Neyle was held by the plaintiff, who drew the interest thereon regularly until January, 1872.

IX. That in January, 1872, Dr. Witsell and plaintiff entered into an agreement with one P. Gadsden Hasell to obtain from him advances for that year's crop.  The agreement was in writing, and was signed by plaintiff and her husband.  This agreement was not produced, as it could not be found.  It appears, however, from the testimony, that Hasell agreed to advance $1,000 in sums as should from time to time be needed, and was to be secured by lien on the crop; and $2,500 of the said city stock was to be pledged to secure the deficiency which would exist should the crop security prove insufficient.  That Mrs. Witsell consented to the pledging of the stock, and gave her husband the scrip to be delivered to Hasell.

X. That Dr. Witsell delivered the said scrip to said Hasell, without any other endorsements than those before stated; but Hasell desired it endorsed by Charles E. Miller, trustee, and returned it to Dr. Witsell to procure that endorsement.  The latter took it to Walterboro, and had it endorsed Charles E. Miller, trustee, in blank, he witnessing the signature.  After it was so endorsed, Dr. Witsell took it to Mr. W. L. Campbell, now City Treasurer, but then a

clerk in the office of the City Treasurer, to inquire if it were properly endorsed. Mr. Campbell inquired for what purpose it was to be assigned; and on being told that $2,500 of it was to be pledged to Hasell as a security for advances, he wrote over the signature of Mr. Miller the words: "Transfer $2,500 to P. Gadsden Hasell, and the balance to Charles E. Miller, trustee of Emanuel and Mary S. Witsell." Subsequently, said certificate was presented at the office of the City Treasurer of the City Council of Charleston by P. Gadsden Hasell, and new certificates of stock were issued as directed in the last endorsement on said stock, viz., $2,500 to P. Gadsden Hasell and balance to Charles E. Miller, trustee.

XI. That, subsequently, said P. Gadsden Hasell failed, but not before he had advanced Dr. Witsell some $600, as the complaint alleges. The scrip he had received he had in the meantime assigned to G. W. Williams & Co., the defendants herein.

XII. The allegation of the complaint that the said Emanuel Witsell had placed the said scrip in the hands of said Hasell as collateral security without plaintiff's knowledge or approval is not sustained by the testimony of either plaintiff or her husband; and I therefore find that such scrip was so pledged with the knowledge and consent of plaintiff. I also find that Dr. Witsell acted as agent for his wife in regard to pledging the stock to Hasell.

*Conclusions of law:*

Prior to the adoption of the Constitution of 1868, it is clear that the plaintiff during coverture could have made no valid disposition of the city stock, part of her legacy as aforesaid, nor could she have placed any valid charge upon it. This stock was a part of her separate estate, created by the will of Mr. Alexander Fraser; and, by the well-settled law of this State, she could not dispose of it or change it except in the form and manner authorized by the said will. This instrument, so far from authorizing any mode of alienation or change thereof, seeks rather to restrain the same by declaring that the property shall not be liable for her debts.

It is contended that the present Constitution and laws of this State have made a change in this respect. That in 1872, Mrs. Witsell, the plaintiff, could dispose of this property in any manner that she pleased. That she did pledge it to secure an engagement of her husband, and did authorize the transfer made by the City Council's Treasurer.

The Constitution, Article XIV, Section 8, provides: "The real and personal property of a woman held at the time of her marriage, or that which she may thereafter acquire, either by gift, grant, inheritance, devise, or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be held as her separate property, and may be bequeathed, devised or alienated by her the same as if she were unmarried."

An Act entitled "An Act to carry into effect the provisions of the Constitution relative to the rights of married women," approved 27th January, 1870, provides:

"Sec. 1. That the real and personal property of a married woman, whether held by her at the time of her marriage or accrued to her thereafter, either by gift, grant, inheritance, devise, purchase, or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be her separate property.

"Sec. 2. A married woman shall have power to bequeath, devise or convey her separate property in the same manner and to the same extent as if she were unmarried," &c., &c.

S. L., vol. 14, p. 325.

Under the will of Mr. Alexander Fraser, I am of the opinion that the plaintiff was entitled, after the death of Mrs. Mary Fraser, to the beneficial interest in the legacy of $9,000, which was to be invested for her sole and separate use, and of course to the same interest in the city stock, which she selected as a part of that legacy; and that the rights and obligations of the parties were properly expressed when Mrs. Neyle, as executrix of Mr. Fraser's will, ordered, by endorsement thereon, the scrip for the said stock to be transferred to herself as trustee. I think that Mrs. Neyle held the legal estate in said scrip, with the beneficial estate, for her sole and separate use in the plaintiff.

If this is correct, then the language of the Constitution and law above quoted does not apply to this case, as I think that in both the language refers to property the legal title to which is held by a woman, or the legal title to which is given or granted to her after marriage. Property in which she is interested, but which is held by a trustee, cannot, I think, be said to be held by her.

But, however this may be, it is clear that wherever the legal title might have been, whether in Mrs. Neyle or in the husband, as trustee, that Mrs. Witsell had a separate estate in the stock, which was not liable for the debts of her husband, exclusive of the provi-

sions of the Constitution and laws referred to. And I think that the said provisions were only intended and do only apply to such property held by or coming to a married woman, as to which the marital rights of the husband would attach, and which would be liable for his debts or subject to his disposition.

The second Section of the Act of 1870, before quoted, though appearing in itself to refer to all the separate property of a married woman, is fairly and properly to be construed, I think, in a more restricted sense. The Act was intended expressly to carry into effect the provisions of the Constitution referred to, and the first two Sections thereof mean nothing more than Section 8 of the 14th Article of the Constitution.

If the construction now given to the present Constitution and laws is correct, it follows that, while with regard to what was before their adoption as the separate property of a married woman, she can only exercise the power of disposing given by the instrument creating the separate estate; yet with regard to such other property as the husband could before have control of in whole or in part, she has the entire and absolute *jus disponendi.* Such result seems to me to justify the construction now given; for, while it may be the policy of the present law to take away any control from the husband, and to give the absolute control to the woman over such property which was given or came to her unfettered with any condition or qualification, it may not be, and is not necessarily, its policy to interfere with those restraints and limitations upon her power of disposition which the former law imposed upon property settled to her separate use. And it may not especially be its object to interfere with such restraints as existed by law at the time when the settlements were made, or, as in this case, when the will spoke. Whether or not the Constitution or the Legislature could have done away with such restraints if they pleased, I think that they have not in fact done so.

In support of these views, I beg leave to refer to some of the authorities that have been submitted to me.

Under a statute at least as strongly in favor of the rights of a married woman as those of our own under consideration, the Supreme Court of the United States held that they did not apply to the inchoate right of dower in the husband's lands; and Mr. Justice Bradley, who delivered the opinion of the Court, said that the statute referred " to property which, but for the statute, he (the husband) would acquire an interest in by right of marriage. The sole

object of the statute was to prevent his acquiring such interest in her property."—*Sykes* vs. *Chadwick*, 18 Wall., 145.

A law of Pennsylvania of 1848 enacts that "every species and description of property, whether consisting of real, personal or mixed, which may be owned by or belong to any single woman, shall continue to be the property of such woman as fully after her marriage as before; and all such property, of whatever name or kind, which shall accrue to any married woman during coverture, * * * shall be owned, used and enjoyed by such married woman as her separate property," &c., &c. The Act further gives her the power of disposition by will and during coverture by joining with her husband. In 1852, real estate was conveyed to the wife in fee for her sole and separate use. She joined with her husband in a sale thereof, and the sale was held good.—*Haine* vs. *Ellis*, 24 Penn., 253.

A husband deposited money with the Pennsylvania Company, the income to be used for the support of his wife. Afterwards, husband and wife assigned the same according to the form of Act of 1848. The Court held that the Act of 1848 does not enable a married woman to dispose of property held by a trustee for her separate use. Over such property she has no power that is not expressed in the instrument by which the trust is created.—*Pennsylvania Co.* vs. *Foster*, 11 Casey, 35; Penn. State Rep., 134.

In *Wright* vs. *Brown and wife*, (44 Penn., 224,) the Court held that *Haine* vs. *Ellis* is not a correct enunciation of the law. That the Act of 1848 has no relation to estates settled to the separate use of married women, whether a trustee be named in the deed of settlement or not; and that in both cases, married women have no power of alienation beyond such as is expressly given in the instrument by which the estates are created.

In *Daly* vs. *Callaghan*, (16 N. Y., 71,) quoted on behalf of defendant, the City Council, there was a lease of real estate to a married woman, under statutes similar to those under consideration; the Court held that she could sue for possession alone, without joining her husband. In giving the opinion of the Court, Judge Bowen said that "the object and intent of the Act in question was to give to married women the use, control and right to dispose of all property of every description held by them at the time of marriage or acquired subsequently, without regard to the manner in which, or the face of the instrument by which it was transferred."

It does not appear that the case was property settled to the separate use of the married woman. But when it is considered that under the laws of New York, as I believe is the case, the English rule prevailed as to the power of a married woman over her separate estate, the effect of the statutes would be to place all her property, whether acquired under such settlement or otherwise, at her disposal; and such expressions as the above would be fully justified, without deciding anything in conflict with the construction I have given. '

In *Yale* vs. *Dederer*, (8 N. Y., 265,) also quoted by defendant, the Court said: "In this juncture of the case, we must assume that the appellant's title is legal and not equitable; her statement would be false, if we take for granted the existence of a trust for her benefit, created within the last twenty-eight years." The Court also says that "it is quite another question, however, whether she may not change her legal estate, held under this statute, in the cases and to the extent recognized by Courts of equity in respect to estates held under a trust for her separate use."

This case seems to make a clear distinction in these expressions, and in others, between those estates which were, under prior laws, the separate estate of the wife, and those which became so by the operation of the statutes similar to those before us.

After a full examination of all the authorities to which I have had access, there seems to me nothing to warrant a decision that such statutes as those in question enlarge the *jus disponendi* of a married woman over any property but such as becomes her separate estate by the statutes themselves, and which, but for such statutes, would fall under the control of her husband.

To apply the conclusions of law to which I have come: As no such power was given in Mr. Fraser's will, the pledging of the stock to which Mrs. Witsell assented was void; the transfer by the City Council to Hasell was void so far as the City Council are concerned, and the plaintiff is entitled to recover $2,500 of stock, or the value thereof, with the interest due thereon from 1st January, 1872. The transfer to Hasell was not made by the person holding the legal estate, or any estate at all in fact; and even if it had been so made, the City Council was bound to know the trusts, under the circumstances of this case, and are responsible for the want of proper authority to transfer.

In order, however, to bring the entire case to the attention of the Court in this report, I beg leave to call attention to another point

which arises therein from a construction of the law different from that which I have adopted.

Admitting that, under the present law of South Carolina, the plaintiff had a right to use or dispose of the stock in question as she might think proper, the question has been raised: what did she do? Did she authorize a transfer of $2,500 thereof to Hasell?

It is contended for the City Council that she did. For the plaintiff, that she did not authorize an absolute transfer, but of a pledge to secure the advance actually made by Hasell.

Now, Mr. Miller never was the lawful trustee of this stock, but the endorsement upon the scrip referred to him as such, and, under the impression that he was such trustee, Hasell desired his signature, which was procured by Dr. Witsell.

Suppose that Miller really was the trustee for the sole and separate use of the plaintiff, the City Council could not properly transfer without the consent of the plaintiff. It was bound to know whether or not she did consent, and by its own rule, as stated in the answer of the said defendant, Mrs. Witsell should have endorsed her name on the scrip.

However, though she did not sign it, if the plaintiff or her agent had declared to the City Council or its agent that she desired or acquiesced in an absolute transfer to Hasell, then she would be bound.

I think that Dr. Witsell was her agent in this transaction, and that if he had represented to Mr. Campbell that there was to be an absolute transfer, she would be bound to the extent of the $2,500.

But the only authority expressed to the City Council on behalf of Mrs. Witsell carried with it the knowledge that the stock was to be pledged to secure the advances to be made by Hasell; that it was not to be an absolute conveyance, but a pledge.

The City Council knew, therefore, that Hasell held the $2,500 transferred to him upon trust; and when he applied to transfer the same, upon the sale by him to G. W. Williams & Co., they were bound at their peril to know that he was justified in the sale thereof.

To the extent of the $600 admitted in the complaint, Hasell had a right to sell and transfer; and if it is held by the Court that Mrs. Witsell could dispose of the stock, then, in accordance with the point last considered, the plaintiff would be entitled to $2,500, less the said $600 of stock, or stock for $1,900, or the value thereof,

with interest from 1st of January, 1872. I think there is no valid claim against the defendants, G. W. Williams & Co.

The City Council of Charleston excepted to the report of the Referee on the grounds:

1. Because the said Referee reports as a conclusion of law that the plaintiff, after the adoption of the Constitution of South Carolina of 1868, had not such a separate estate in the city stock in controversy as gave her the right of transferring and conveying the same to P. Gadsden Hasell; whereas the said Referee should have reported as a conclusion of law that the Constitution of 1868 gave her absolute control over the said stock, and any assignment or transfer of the same, or any part thereof, to P. Gadsden Hasell was binding upon her.

2. Because the Special Referee erred in reporting as a conclusion of law that plaintiff was entitled to recover $2,500 of the city stock of this defendant, or the value thereof, with interest on the same from January 1st, 1872; whereas said Referee should have reported as a conclusion of law that as plaintiff agreed in writing to pledge the stock in question, and delivered the certificate thereof to the pledgee for that purpose, and as she, by her husband, her authorized agent, procured said certificate to be endorsed for the purpose of allowing said Hasell to transfer the same, she is estopped from denying the validity of the transfer to said Hasell, and is not entitled to recover.

3. Because the Special Referee erred in reporting as a conclusion of law that the defendant knew that the $2,500 of city stock was to be *pledged* to Hasell; whereas said Special Referee should have reported as a conclusion of law that the knowledge of Wm. L. Campbell, a clerk in the office of the City Treasurer, that said stock was to be pledged was not the knowledge of this defendant; and that said Campbell, when he filled up the blank on the back of said certificate of stock with a direction to transfer $2,500 to P. Gadsden Hasell, was acting as the friend and agent of Dr. Emanuel Witsell, and not in his character as clerk of the said City Treasurer; and, further, that if such direction on the back of said certificate was improperly placed thereon by said Campbell, this defendant is not liable for such error, and it was bound to make the transfer on its books when demanded by said Hasell, and such transfer is legal and valid.

REED, J. On hearing the report of J. E. Burke, Referee, and the exceptions thereto, it is ordered that the exceptions be over-ruled and the report confirmed.

It is further ordered that the plaintiff recover against the City Council of Charleston one thousand dollars, the value of the stock improperly transferred to P. G. Hasell, and the costs of this action.

The City Council of Charleston appealed.

*Corbin & Stone*, for appellant.

*Pressley, Lord & Inglesby*, contra.

March 15, 1876. The opinion of the Court was delivered by

WILLARD, A. J. The plaintiff charges that the defendants have illegally transferred city stock, standing in the name of a trustee, to a stranger. It appeared by the endorsement on the stock at the time the transfer was made that the party who authorized the transfer held the stock subject to a trust in favor of the plaintiff. Under our decision in *Magwood* vs. *South Carolina Railroad*, the city corporation could not legally make such a transfer unless the trustee possessed authority to cause such transfer to be made. The question whether the trustee possessed such authority depends, in the first instance, upon the power of the plaintiff, as a married woman, to authorize the sale of property placed in the hands of a trustee for her use and enjoyment, and for its protection against liabilities for her own debts and those of her husband; and if it be found that the plaintiff possessed such authority, whether she exercised it.

It was contended that C. E. Miller, by whose direction, endorsed on the stock, the transfer was made, appeared by the endorsements on the stock itself not to have the authority of a trustee as it regards the stock. It will not be necessary to examine this objection, for, as will appear hereafter, the determination of that question, one way or the other, cannot affect the final results of the case.

The plaintiff had no authority to give validity to the transfer, unless derived from the Constitution, (Article XIV, Section 8,) or the Act "to carry into effect the provisions of the Constitution in relation to the rights of married women," passed January 27, 1870, (14 Stat., 325.)

It is contended that the plaintiff authorized her husband, as her agent, to pledge the stock in question to enable him to carry on his business of planting. It was not, therefore, the case of an investment of trust funds by a trustee consented to by a married woman, the *cestui que trust*, as in *Frazier* vs. *Center*, (1 McC. Ch., 270,) nor was it the case of a trustee incurring obligations for the benefit of the trust estate, as in *Carter* vs. *Eveleigh*, (4 DeS. Eq., 19.) On the contrary, it is simply the question of the power of a married woman to charge her separate estate for the benefit of her husband—in the present case, to enable him to borrow money to carry on his business. Independent of the effect of the Constitution enlarging the powers of married women, and the Act of the Legislature intended to carry these constitutional powers into effect, she possessed no such authority as was decided by this Court in *Dunn* vs. *Dunn*, (1 S. C., 350.)

The Section of the Constitution in question is as follows: "The real and personal property of a woman held at the time of marriage, or that which she may thereafter acquire, either by gift, grant, inheritance, devise, or otherwise, shall not be subject to levy and sale for her husband's debts, but shall be held as her separate property, and may be bequeathed, devised or alienated by her the same as if she were unmarried: *Provided*, That no gift or grant from her husband shall be detrimental to the just claims of his creditors."—Constitution, Art. XIV, § 8.

The first question that arises is, whether equitable interests in lands are embraced by the terms of this Section. The object of the Section is threefold: First, to convert the property of a wife, acquired before or during marriage, into a legal separate estate; second, to prevent its subjection to the payment of her husband's debts; and, third, to confer upon the married woman the same power of disposition or alienation, as to such separate estate, as that enjoyed by a *femme sole*. The subject matter upon which this characteristic is impressed is described as "real and personal property." Are the terms "real and personal" used to exclude from the category certain classes of property, or kinds of possession and ownership, ordinarily embraced under the description "property," where no qualifying terms are employed to narrow their force; or, on the other hand, are these terms employed for the purpose of giving to the idea of property, as thus used, its most comprehensive significance? If the latter is the correct interpretation, which we think it is, then

choses in action and equitable estates and demands are included under the words "real and personal property." The latter mode of employing these terms is usual, indeed it is the natural sense of the terms, to be understood when nothing exists to point an intent to use them in an exclusive, rather than an inclusive, sense. This view will be strengthened when we come to look at the object of this Section, but first we must notice an argument urged as affording ground for limiting the sense of these terms.

It is contended that the words "real and personal property of a woman" are qualified and restricted by what immediately follows, viz., "held at the time of her marriage, or that which she may thereafter acquire." It is contended that "held" is used to qualify the general expression "real and personal property." For the purpose of enforcing this view, the word "held" is interpreted in a technical sense. It is said that a *cestui que trust* does not hold the lands out of which such equitable interest arises, but that they are held by the trustee.

"Held," in the connection in which it is used, does not imply limitation, but is used to give the largest effect to the terms "real and personal property" in their application to property of a married woman.

Is the word "held," standing by itself, to be taken in a technical sense? If so, what is the effect of such reading? As a technical term, "held" embraces two ideas—that of actual possession of some subject of dominion or property, and that of being invested with legal title or right to hold or claim such possession. We speak of lands being held in fee, or for a term of years, or by adverse possession, meaning that possession is had of these lands under claims to such possession of the nature described by these terms. So we speak of a legal title being held in respect of lands, that expression not necessarily implying the actual possession of the lands to which such title relates. This term is constantly applied to cases of possession had of anything that is the subject of property. It does not follow, then, merely from the fact that "held" is taken in a technical sense, that it limits the expression "real and personal property," for if everything capable of being possessed may be "held," then the use of that word does not lead to the exclusion of choses in action and equitable interests and estates from that category.

But the argument goes further and contends that in its application to a trust estate the term "held" is to be used in a *particular* technical sense. We speak of trust estates as held by one and enjoyed by another. That to which we refer as held in this case is the title with or without actual possession. This limited sense of the word "held" depends entirely on the context in that mode of using it, and not upon its own inherent force of expression; change the context and this qualified meaning of the term disappears. It does no violence to technical propriety to say of lands in the hands of a trustee that a beneficial interest in such lands is "held." It is clear that unless the words "real and personal property" are read as precisely equivalent to "the title to real and personal property," there is no ground whatever to apply the argument in question to the case in hand.

On the contrary, the Section affords a definition of "held" by supplying its equivalent, as to which there can be no doubt. It says "held at the time of her marriage, or which she may thereafter acquire." The subjects of holding and those of acquisition are intended to be the same. The object of the particular clause is to put property acquired before marriage on the same footing with that acquired afterwards. "Held" is used as equivalent to acquired, and that word cannot be limited in the way contended for. It is clear both in the language and intent of this clause that there was no design to use the word "held" in any sense limiting the generality of the expression "real and personal property," but that, assuming that the general purpose of the Section requires that these terms shall be read as embracing equitable estates, the word "held" is in entire consistence with that reading.

It remains, then, to gather up the general intent from all parts of the Section taken together. Its object was to enlarge what was theretofore known as the wife's separate estate, so as to embrace all acquisitions, past or future, of such a nature that, if she were a *femme sole*, they would vest in her as property, and to enlarge her powers over such property to the same extent as if she was a *femme sole*, and at the same time to shield that separate estate from liability to the husband's debts against her will. The same reason that would exclude equitable estates from this statute would also exclude choses in action and demands of an equitable nature. This would limit the faculty thus conferred without any good reason. The decisions of the Courts of this State,

followed by us in *Dunn* vs. *Dunn*, did not rest on the judgment of the Courts that the ends of justice were best subserved by depriving a married woman of all control over her separate estate, except where authority for that purpose was conferred by the instrument creating that separate estate, but upon the fact that the state of the common law prevented equity from enlarging her powers over her separate estate. It was felt that full justice was not attained under that view, and that there was an anomaly in the deprivation of the power to do right, unaccompanied by deprivation of the power to do wrong.

Elsewhere the Courts of equity had found means to escape in a greater or less degree from the dilemma, and put an interpretation upon the powers of married women over their separate estates, that found an exception in the common law rule of incapacity, but in this State the Judges left the rule of the common law in full force until it should be changed by legislative authority. Now that the Constitution has reversed the rule of the common law, and substituted general competence for the former rule of incompetence, as it regards the holding and acquisition of a separate estate, it is not for the Courts, on nice readings of its text, to restore a state of things from which the Courts of equity have long striven to be released.

If equitable estates are excluded because not " real and personal property," in an exclusive sense of those terms, then, as has been said, choses in action and demands that can only be enforced by means of suits in equity are equally excluded; for the expressions real and personal property are more often used as denoting something distinguishable from choses in action than for distinguishing equitable estates from legal estates. It certainly cannot have been intended that rights of this nature should be excluded from the benefits conferred by the Constitution. When future acquisitions are carefully protected, it certainly could not have been intended to neglect rights of action and demands which might be the means of such future acquisition of tangible property.

We have been referred to cases decided in the Courts of other States on statutes similar in their general intention to our own, some regarded as favoring the view that has been expressed and others as opposing it. When the construction of our own Constitution is free from doubt, little aid can be obtained from the decisions in the Courts of other States. Doubtful expressions, however,

should receive, to aid their solution, all the light that can be thrown upon them from judicial minds, contemplating them from the different standpoints afforded by the different statutes and circumstances relating to the same subject in other States and countries. In the present case the meaning of our Constitution is free from doubt, and it demands interpretation at our hands according to the expressed intent of the people of the State who framed it as our organic law.

It will not be necessary to look into the Act passed under the Constitution in detail. It could not narrow the sense of the Constitution, and, as we have seen, it is not necessary to look elsewhere for an enlargement of its provisions in order to admit the present case to its advantages.

The next question is, whether the provisions of the Constitution apply to the powers of a married woman over a separate estate consisting of a beneficial interest under a trust of personal property, where such trust was in existence at the time the Constitution went into effect.

At the adoption of the Constitution the legal title to the stock in question was in Jane Neyle in trust for the plaintiff, Mrs. Witsell. Jane Neyle died in 1869, and no trustee has been appointed to succeed her in the trust, unless it was competent for the administrator of the trustee to appoint such a successor.

The objection urged to allowing the Constitution to become operative as to conferring enlarged powers on the *cestui que trust* is, in effect, that it tends to change the nature of the trusts on which the property was held. Is this the fact?

The trust in question arose under the following words of the will of the plaintiff's testator: "And the said sum of nine thousand dollars to be invested for the sole, separate and exclusive use, benefit and behoof of the said Mary Susan Neyle, and not to be in any manner liable for her debts, or for the debts and contracts of any husband she may marry hereafter."

It is noticeable that this devise did not, in terms, designate a trustee, nor create a trust, but its intention must be assumed to be the creation of a trust *in futuro*. The only respect in which the trusts thus contemplated are limited, is by the direction that the beneficial enjoyment shall be in M. S. Neyle, now Mrs. Witsell, the plaintiff, and that such estate shall not be liable for the debts either of the plaintiff or of any husband she might marry.

Had the will imposed certain definite characteristics in the trust, conformable to the then existing laws, and after the purpose of the will had become executed by the creation of the contemplated trust the Constitution had been changed so as to tend to effect a change in the trust in these respects, an interesting question might have been presented affecting the construction and possibly the efficacy of the law in such respect.

The will, however, does not bear such a construction. The only expressed objects of the trust, assumed to have been intended, affect the rights of creditors of the plaintiff and her husband. The powers of the *cestui que trust* over her beneficial interest are not limited or even named.

There is no ground from which to raise an implied intent that the plaintiff should have no power of alienating her beneficial interest. It may be said that the testator would naturally deem it equally important to prevent the plaintiff from voluntarily parting with the bequest to creditors, as to prevent them from seizing it against her will. Where there is a question of effectuating a general intent in order to prevent a failure of the testator's bounty by reason of some defective expression of his particular intent, a large liberty may be enjoyed in referring the ultimate motive that influenced the testator; but where the end of the inquiry is to withdraw the subject of bequest from the operation of a general statute, especially an enabling statute, such liberty of implications is not admissible. In the latter case the inferences must be limited to that which appears to have formed a part of the testator's mind and purpose.

In the present case the will affords no evidence that the question of the alienation by the legatee was before the mind of the testator. The state of the law was such as to render it unnecessary that any attention should be paid to limiting her powers as a married woman over her beneficial interest. He must be regarded as intending that her powers should be such as the law permitted, not necessarily such as the then existing law permitted, for he is presumed to have known that the law was susceptible of change. If he acted from the opinion that the law was unlikely to be changed, that was equivalent to leaving the matter to be regulated altogether by the law.

The provisions as to protecting the bequests from creditors cannot be construed as intending more than a direction to put the instru-

ment in the form of an ordinary trust for the benefit of a married woman. The declared object is the ordinary object of such trusts.

We must conclude that the trust in question is without defined limitation as it regards the powers of the *cestui que trust* over her beneficial interest, and that it is subject to the general rules affecting trusts of that nature.

Whatever view may be taken of the question whether one holding a beneficial interest as *cestui que trust,* under the terms of a will or deed creating a trust, can directly destroy or impair such trust, it appears clear that, in certain cases, the trust may be indirectly destroyed through the power of alienation conferred upon a *cestui que trust* who is *sui juris.* Such a case exists when the whole beneficial interest in the trust estate is in such *cestui que trust,* without remainder or condition capable of defeating such beneficial interest, and when the whole object of the trust is to secure in such *cestui que trust* an enjoyment of a certain character. In the case just stated, if the *cestui que trust* be *sui juris,* the beneficial interest may be alienated, and no provision of the will or deed intended to prevent such alienation can destroy such power of alienation. If, then, the whole object of the trust was to secure in such particular *cestui que trust* a certain enjoyment of such beneficial interest, then the alienation of the interest of such *cestui que trust,* contrary to the intention of the trust, necessarily defeats the trust, because it defeats the whole object that the trust had in view.

*Nix* vs. *Bradley,* (6 Rich. Eq., 43,) fully sustains the proposition just advanced. Although the alienation in that case only defeated the trust as it regarded a portion of the trust property, leaving it still in operation as to the portion in respect of which there was no exercise of the power of alienation, still power to defeat in part implies power to defeat wholly, for a rule that would protect the whole trust fund against destruction would protect each part with equal efficiency. The case just cited was fully considered and amply supported by authority.

The language of that case is that the power may be exercised by a *femme sole* who is *sui juris,* but there is no force limiting it to one who is a *femme sole.*

At that time the question could not arise in the case of a married woman, for she could have no authority to affect the trust or her beneficial interest under it, except that derived from the instrument creating it. Now that a married woman is in terms invested with

the powers of a *femme sole* as to her separate property, she is brought within the terms of the decision in *Nix* vs. *Bradley*, as well as within the principles upon which that case was decided.

It must be concluded that at the time when the stock in suit was pledged, and when it was sold by the pledgee and transferred to a third person, the plaintiff was competent to authorize such transfer, it appearing that she held the whole beneficial interest without remainder or condition that could defeat it. Such being the case, her consent to the pledge of the stock would in equity be equivalent to her formal transfer of it.

Did she consent to the pledge of the stock? The Referee found that the stock was so pledged, with the knowledge and consent of the plaintiff, Mrs. Witsell, but that such authority and consent went only to the extent of authorizing the pledgee to hold the stock as security for advances made. We find no ground for disturbing this finding of the Referee.

The sale of the pledgee was not warranted by the terms of the contract upon which it was pledged. The advances made were not equal to what was agreed to be made; an amount of stock was disposed of greatly in excess of what was requisite to cover the amounts advanced, and the sale was prematurely made. Had the stock been regularly transferred by proper endorsements showing a complete title to the pledgee, a purchaser for value and without notice could have obtained good legal title, and without being chargeable with any equities existing between the plaintiff and the pledgee. But the endorsements showed that the legal title to the stock was subject to a trust, and such notice affected the purchaser. The acts of the city confirming this defective title of the purchaser by cancelling the stock or evidence of indebtedness belonging to the plaintiff, in part at least, and issuing new evidence of indebtedness to the purchaser, caused damage to the plaintiff, for which she is entitled to recover, as the defendant had notice by the endorsement of the trust. The plaintiff was, therefore, entitled to recover the value of the stock thus transferred by the city, less the amount due for principal and interest to Hasell.

It would seem that the judgment of the Circuit Court allowed to the plaintiff the value of the stock sold without deduction. This was erroneous. To the extent of the amount due to Hasell for advances, the plaintiff had by her consent parted with all interest, and that amount cannot enter as an element into the damages she sustained by the improper transfer of the stock.

The propositions advanced in the third exception by the city need not be particularly considered. The stock contained, in its endorsement, notice of the trust, and, being so charged, they can only discharge themselves by proof of actual authority or consent on the part of the plaintiff, and the proof in this respect falls short of giving them full protection.

The judgment must be set aside and the cause remanded for a judgment in conformity with the foregoing.

*Moses,* C. J., and *Wright,* A. J., concurred.